**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

v.

BASSAM YACOUB SALMAN, AKA
Bessam Jacob Salman,
*Defendant-Appellant*.

No. 14-10204

D.C. No.
3:11-CR-00625-EMC-1

OPINION

Appeal from the United States District Court
for the Northern District of California
Edward M. Chen, District Judge, Presiding

Argued and Submitted
June 9, 2015—San Francisco, California

Filed July 6, 2015

Before: Morgan Christen and Paul J. Watford, Circuit
Judges, and Jed S. Rakoff, Senior District Judge.[*]

Opinion by Judge Rakoff

---

[*] The Honorable Jed S. Rakoff, Senior District Judge for the U.S.
District Court for the Southern District of New York, sitting by
designation.

## SUMMARY[**]

---

### Criminal Law

The panel affirmed a conviction by jury trial for conspiracy and securities fraud arising from an insider-trader scheme.

The panel held that the defendant did not waive a sufficiency of the evidence issue raised only in a supplemental brief because both parties had an opportunity to brief the issue and to address it at oral argument.

The panel held that the evidence was sufficient to support the conviction because it showed that an insider breached his fiduciary duty by disclosing information to a trading relative, and that the defendant knew of that breach at the time he traded on it. The panel declined to hold that under the Second Circuit's opinion in *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014), the government also was required to prove that the insider disclosed the information for a personal benefit.

---

### COUNSEL

John D. Cline (argued), Law Office of John D. Cline, San Francisco, California, for Defendant-Appellant.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Merry Jean Chan, Assistant United States Attorney (argued), Melinda Haag, United States Attorney, Barbara J. Valliere, Chief, Appellate Division, United States Attorney's Office, San Francisco, California, for Plaintiff-Appellee.

## OPINION

RAKOFF, Senior District Judge:

Defendant-Appellant Bassam Yacoub Salman appeals his conviction, following jury trial, for conspiracy and insider trading. He argues that the evidence was insufficient to sustain his conviction under the standard announced by the United States Court of Appeals for the Second Circuit in *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014), which he urges us to adopt. We find that the evidence was sufficient, and we affirm.[1]

## BACKGROUND

This case arises from an insider-trading scheme involving members of Salman's extended family. On September 1, 2011, Salman was indicted for one count of conspiracy to commit securities fraud in violation of 18 U.S.C. § 371 and four counts of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. §§ 240.10b-5, 240.10b5-1 and 240.10b5-2, and 18 U.S.C. § 2. At trial, the Government presented evidence of the following:

---

[1] Salman raised several additional claims relating to the same conviction. Those claims are addressed in a separate memorandum disposition filed concurrently with this opinion.

In 2002, Salman's future brother-in-law Maher Kara joined Citigroup's healthcare investment banking group. Over the next few years, Maher began to discuss aspects of his job with his older brother, Mounir ("Michael") Kara. At first, Maher sought help from Michael, who held an undergraduate degree in chemistry, in understanding scientific concepts relevant to his work in the healthcare and biotechnology sectors. In 2004, when their father was dying of cancer, the focus of the brothers' discussions shifted to companies that were active in the areas of oncology and pain management. Maher began to suspect that Michael was trading on the information they discussed, although Michael initially denied it. As time wore on, Michael became more brazen and more persistent in his requests for inside information, and Maher knowingly obliged. From late 2004 through early 2007, Maher regularly disclosed to Michael information about upcoming mergers and acquisitions of and by Citigroup clients.

Meanwhile, in 2003, Maher Kara became engaged to Salman's sister, Saswan ("Suzie") Salman. Over the course of the engagement, the Kara family and the Salman family grew close. In particular, Salman and Michael Kara became fast friends. In the fall of 2004, Michael began to share with Salman the inside information that he had learned from Maher, encouraging Salman to "mirror-imag[e]" his trading activity. Rather than trade through his own brokerage account, however, Salman arranged to deposit money, via a series of transfers through other accounts, into a brokerage account held jointly in the name of his wife's sister and her husband, Karim Bayyouk. Salman then shared the inside information with Bayyouk and the two split the profits from Bayyouk's trading. The brokerage records introduced at trial revealed that, on numerous occasions from 2004 to 2007,

Bayyouk and Michael Kara executed nearly identical trades in securities issued by Citigroup clients shortly before the announcement of major transactions. As a result of these trades, Salman and Bayyouk's account grew from $396,000 to approximately $2.1 million.

Of particular relevance here, the Government presented evidence that Salman knew full well that Maher Kara was the source of the information. Michael Kara (who pled guilty and testified for the Government) testified that, early in the scheme, Salman asked where the information was coming from, and Michael told him, directly, that it came from Maher. Michael further testified about an incident that occurred around the time of Maher and Suzie's wedding in 2005. According to Michael Kara, on that visit, Michael noticed that there were many papers relating to their stock trading strewn about Salman's office. Michael became angry and admonished Salman that he had to be careful with the information because it was coming from Maher. Michael testified that Salman agreed that they had to "protect" Maher and promised to shred all of the papers.

The Government further presented evidence that Maher and Michael Kara enjoyed a close and mutually beneficial relationship. Specifically, the jury heard testimony that Michael helped pay for Maher's college, that he stood in for their deceased father at Maher's wedding, and, as discussed above, that Michael coached Maher in basic science to help him succeed at his job. Maher, for his part, testified that he "love[d] [his] brother very much" and that he gave Michael the inside information in order to "benefit him" and to "fulfill[] whatever needs he had." For example, Maher testified that on one occasion, he received a call from Michael asking for a "favor," requesting "information," and

explaining that he "owe[d] somebody." After Michael turned down Maher's offer of money, Maher gave him a tip about an upcoming acquisition instead.

Finally, the Government presented evidence that Salman was aware of the Kara brothers' close fraternal relationship. The Salmans and the Karas were tightly knit families, and Salman would have had ample opportunity to observe Michael and Maher's interactions at their regular family gatherings. For example, Michael gave a toast at Maher's wedding, which Salman attended, in which Michael described how he spoke to his younger brother nearly every day and described Maher as his "mentor," his "private counsel," and "one of the most generous human beings he knows." Maher, overcome with emotion, began to weep.

The jury found Salman guilty on all five counts. Salman then moved for a new trial pursuant to Rule 33 of the Federal Rules of Criminal Procedure, on the ground, *inter alia*, that there was no evidence that he knew that the tipper disclosed confidential information in exchange for a personal benefit. The district court denied his motion in full.

Salman timely appealed, but did not raise a challenge to the sufficiency of the evidence in his opening brief. After he filed his reply brief, the United States Court of Appeals for the Second Circuit, in *United States v. Newman*, 773 F.3d 438 (2d Cir. 2014), vacated the insider-trading convictions of two individuals on the ground that the Government failed to present sufficient evidence that they knew the information they received had been disclosed in breach of a fiduciary duty. *Id.* at 455. After the Second Circuit denied the Government's petition for panel rehearing and rehearing *en banc*, *United States v. Newman*, Nos. 13-1837, 13-1917, 2015

WL 1954058 (2d Cir. Apr. 3, 2015), Salman promptly moved for leave to file a supplemental brief arguing that the Government's evidence in the instant case was insufficient under the standard announced in *Newman*, which he urged this Court to adopt. We granted Salman's motion and gave the Government an opportunity to respond.

## DISCUSSION

### A.

The threshold question is whether Salman waived the present argument by failing to raise it in his opening brief on this appeal, even though he had raised it below and, after *Newman* was decided, promptly raised it in a supplemental brief that the Government responded to before oral argument. Ordinarily, we will not consider "'matters on appeal that are not specifically and distinctly argued in appellant's opening brief.'" *United States v. Ullah*, 976 F.2d 509, 514 (9th Cir. 1992) (quoting *Miller v. Fairchild Indus., Inc.*, 797 F.2d 727, 738 (9th Cir. 1986)). However, we make an exception to this general rule (1) for "good cause shown" or "if a failure to do so would result in manifest injustice," (2) "when it is raised in the appellee's brief," or (3) "if the failure to raise the issue properly did not prejudice the defense of the opposing party." *Id.* (internal citation and quotation marks omitted).

The third exception applies here. As both parties have had a full opportunity to brief this issue and to address it at oral argument, the Government cannot complain of prejudice. *See Hall v. City of Los Angeles*, 697 F.3d 1059, 1072 (9th Cir. 2012) (finding no prejudice where parties had opportunity to brief the issue); *Ibarra-Flores v. Gonzales*, 439 F.3d 614, 619 n.4 (9th Cir. 2006) (considering issue not raised in opening

brief where opponent had an opportunity to address the issue at oral argument). Accordingly, we address Salman's claim on the merits.

## B.

In reviewing a challenge to the sufficiency of the evidence, we must determine whether, when viewed in the light most favorable to the Government, the evidence was "'adequate to allow any rational trier of fact to find the essential elements of the crime beyond a reasonable doubt.'" *United States v. Richter*, 782 F.3d 498, 501 (9th Cir. 2015) (quoting *United States v. Nevils*, 598 F.3d 1158, 1164 (9th Cir. 2010) (en banc)). Salman urges us to adopt *Newman* as the law of this Circuit, and contends that, under *Newman*, the evidence was insufficient to find either that Maher Kara disclosed the information to Michael Kara in exchange for a personal benefit, or, if he did, that Salman knew of such benefit.[2]

The "personal benefit" requirement for tippee liability derives from the Supreme Court's opinion in *Dirks v. S.E.C.*, 463 U.S. 646 (1983). *Dirks* presented an unusual fact pattern. Ronald Secrist, a whistleblower at a company called Equity Funding, had contacted Raymond Dirks, a well-known securities analyst, after Secrist's prior disclosures to the Securities and Exchange Commission ("SEC") had gone for

---

[2] Another holding of *Newman* — that even a remote tippee must have some knowledge of the personal benefit (however defined) that the inside tipper received for disclosing inside information, *see Newman*, 773 F.3d at 450 — is not at issue here, because the jury was instructed that it had to find that Salman "knew that Maher Kara personally benefitted in some way, directly or indirectly, from the disclosure of the allegedly inside information to Mounir ('Michael') Kara."

naught. *Id.* at 649 & 650 n.3. Secrist, for no other purpose than exposing the Equity Funding fraud, disclosed inside information about the company to Dirks, who in turn launched his own investigation that eventually led to public exposure of a massive fraud. *Id.* at 649–50. However, in the process of his investigation, Dirks openly discussed the information provided by Secrist with various clients and investors, some of whom then sold their Equity Funding stock on the basis of that information. *Id.* at 649. Upon learning this, the SEC charged Dirks with securities fraud, and this position was upheld by an SEC Administrative Law Judge and affirmed by the District of Columbia Circuit, after which certiorari was granted. *Id.* at 650–52.[3]

When the case came to the Supreme Court, Justice Powell, writing for the Court, began by noting that, whistleblowing quite aside, corporate insiders, in the many conversations they typically have with stock analysts, often accidentally or mistakenly disclose material information that is not immediately available to the public. *Id.* at 658–59. Thus, "[i]mposing a duty to disclose or abstain solely because a person knowingly receives material nonpublic information from an insider and trades on it could have an inhibiting influence on the role of market analysts, which the SEC itself recognizes is necessary to the preservation of a healthy market." *Id.* at 658. At the same time, the Court continued, "[t]he need for a ban on some tippee trading is clear. Not only are insiders forbidden by their fiduciary relationship from personally using undisclosed corporate information to their

---

[3] The Department of Justice, which successfully prosecuted the perpetrators of the fraud and viewed Dirks as a hero, took the unusual step of filing an amicus brief in the Supreme Court urging rejection of the SEC's theory. *Id.* at 648.

advantage, but they may not give such information to an outsider for the same improper purpose of exploiting the information for their personal gain." *Id.* at 659.

"Thus, the test is whether the insider personally will benefit, directly or indirectly, from his disclosure," *id.* at 662, for in that case the insider is breaching his fiduciary duty to the company's shareholders not to exploit company information for his personal benefit.[4] And a tippee is equally liable if "the tippee knows or should know that there has been [such] a breach," *id.* at 660, *i.e.*, knows of the personal benefit.

Of particular importance here, the Court then went on to define what constitutes the "personal benefit" that constitutes the breach of fiduciary duty. It would include, for example, "a pecuniary gain or a reputational benefit that will translate into future earnings." *Id.* at 663. However, "*[t]he elements of fiduciary duty and exploitation of nonpublic information also exist when an insider makes a gift of confidential information to a trading relative or friend*." *Id.* at 664 (emphasis supplied).

The last-quoted holding of *Dirks* governs this case. Maher's disclosure of confidential information to Michael, knowing that he intended to trade on it, was precisely the "gift of confidential information to a trading relative" that *Dirks* envisioned. *Id.* Indeed, Maher himself testified that, by providing Michael with inside information, he intended to

---

[4] The same is true in a so-called "misappropriation" case, like the instant case, where the fiduciary duty is owed, not to the shareholders, but to the tipper's employer, client, or the like. *See United States v. O'Hagan*, 521 U.S. 642, 652–53 (1997).

"benefit" his brother and to "fulfill[] whatever needs he had." As to Salman's knowledge, Michael Kara, whose testimony we must credit on a challenge to the sufficiency of the evidence, testified that he directly told Salman that it was Michael's brother Maher who was, repeatedly, leaking the inside information that Michael then conveyed to Salman, and that Salman later agreed that they had to "protect" Maher from exposure. Given the Kara brothers' close relationship, Salman could readily have inferred Maher's intent to benefit Michael. Thus, there can be no question that, under *Dirks*, the evidence was sufficient for the jury to find that Maher disclosed the information in breach of his fiduciary duties and that Salman knew as much.

Salman, however, argues that the Second Circuit in *Newman* interpreted *Dirks* to require more than this. Of course, *Newman* is not binding on us, and our own reading of *Dirks* is guided by the clearly applicable language italicized above. But we would not lightly ignore the most recent ruling of our sister circuit in an area of law that it has frequently encountered.

The defendants in *Newman*, Todd Newman and Anthony Chiasson, both portfolio managers, were charged with trading on material non-public information regarding two companies, Dell and NVIDIA, obtained by a group of analysts at various hedge funds and investment firms. *Newman*, 773 F.3d at 442–43. The information came to them via two distinct tipping chains. The Dell tipping chain originated with Rob Ray, a member of Dell's investor relations department. *Id.* at 443. Ray tipped information regarding Dell's earnings numbers to Sandy Goyal, an analyst. *Id.* Goyal, in turn, relayed the information to Jesse Tortora, another analyst, who relayed it to his manager, Newman, as well as to other

analysts including Spyridon Adondakis, who passed it to Chiasson. *Id.* The NVIDIA tipping chain began with Chris Choi, of NVIDIA's finance unit, who tipped inside information to his acquaintance Hyung Lim, who passed it to Danny Kuo, an analyst, who circulated it to his analyst friends, including Tortora and Adondakis, who in turn gave it to Newman and Chiasson. *Id.* Having received this information, Newman and Chiasson executed trades in both Dell and NVIDIA stock, generating lavish profits for their respective funds. *Id.*

The Government presented the following evidence regarding the relationships between the Dell and NVIDIA insiders and their respective tippees. The Dell tipper and tippee, Ray and Goyal, attended business school together and had been colleagues at Dell, but were not "close." *Id.* at 452. Goyal provided career advice and assistance to Ray, for example, discussing the qualifying examination required to become an analyst and editing his résumé. *Id.* This advice began before Ray started to give Goyal information, and Goyal testified that he would have given it as a routine professional courtesy without receiving anything in return. *Id.* As to the NVIDIA tips, the insider, Choi, and his tippee, Lim, were "family friends" who met through church and occasionally socialized with one another. *Id.* Lim testified that he did not provide anything of value to Choi in return for the tips, and that Choi did not know that he was trading in NVIDIA stock. *Id.*

The Second Circuit held that this evidence was insufficient to establish that either Ray or Choi received a personal benefit in exchange for the tip. It noted that, although the "personal benefit" standard is "permissive," it "does not suggest that the Government may prove the receipt

of a personal benefit by the mere fact of a friendship, particularly of a casual or social nature." *Id*. Instead, to the extent that "a personal benefit may be inferred from a personal relationship between the tipper and tippee, . . . such an inference is impermissible in the absence of proof of a *meaningfully close personal relationship* that generates an exchange that is objective, consequential, and *represents at least a potential gain of a pecuniary or similarly valuable nature*." *Id.* (emphasis supplied).

Applying these standards, the court concluded that the "circumstantial evidence . . . was simply too thin to warrant the inference that the corporate insiders received any personal benefit in exchange for their tips," *id.* at 451–52, and furthermore, that "the Government presented absolutely no testimony or any other evidence that Newman and Chiasson knew they were trading on information obtained from insiders, or that those insiders received any benefit in exchange for such disclosures." *Id.* at 453.

Salman reads *Newman* to hold that evidence of a friendship or familial relationship between tipper and tippee, standing alone, is insufficient to demonstrate that the tipper received a benefit. In particular, he focuses on the language indicating that the exchange of information must include "at least a potential gain of a pecuniary or similarly valuable nature," *id.* at 452, which he reads as referring to the benefit received by the tipper. Salman argues that because there is no evidence that Maher received any such tangible benefit in exchange for the inside information, or that Salman knew of any such benefit, the Government failed to carry its burden.

To the extent *Newman* can be read to go so far, we decline to follow it. Doing so would require us to depart from the

clear holding of *Dirks* that the element of breach of fiduciary duty is met where an "insider makes a gift of confidential information to a trading relative or friend." *Dirks*, 463 U.S. at 664. Indeed, *Newman* itself recognized that the "'personal benefit is broadly defined to include not only pecuniary gain, but also, *inter alia*, . . . the benefit one would obtain from simply making a gift of confidential information to a trading relative or friend.'" *Newman*, 773 F.3d at 452 (alteration omitted) (quoting *United States v. Jiau*, 734 F.3d 147, 153 (2d Cir. 2013)).

In our case, the Government presented direct evidence that the disclosure was intended as a gift of market-sensitive information. Specifically, Maher Kara testified that he disclosed the material nonpublic information for the purpose of benefitting and providing for his brother Michael. Thus, the evidence that Maher Kara breached his fiduciary duties could not have been more clear, and the fact that the disclosed information was market-sensitive — and therefore within the reach of the securities laws, *see O'Hagan*, 521 U.S. at 656 — was obvious on its face. If Salman's theory were accepted and this evidence found to be insufficient, then a corporate insider or other person in possession of confidential and proprietary information would be free to disclose that information to her relatives, and they would be free to trade on it, provided only that she asked for no tangible compensation in return. Proof that the insider disclosed material nonpublic information with the intent to benefit a trading relative or friend is sufficient to establish the breach of fiduciary duty element of insider trading.

In Salman's case, the jury had more than enough facts, as described above, to infer that when Maher Kara gave inside information to Michael Kara, he knew that there was a

potential (indeed, a virtual certainty) that Michael would trade on it. And while Salman may not have been aware of all the details of the Kara brothers' relationship, the jury could easily have found that, as a close friend and member (through marriage) of the close-knit Kara clan, Salman must have known that, when Maher gave confidential information to Michael, he did so with the "intention to benefit" a close relative. *Id.*

Accordingly, we find that the evidence was more than sufficient for a rational jury to find both that the inside information was disclosed in breach of a fiduciary duty, and that Salman knew of that breach at the time he traded on it.

**AFFIRMED.**