USA v. Klein (Schulman)

# United States Court of Appeals
## for the Second Circuit

————————

AUGUST TERM, 2018

(Argued: October 22, 2018      Decided: January 10, 2019)

Docket No. 17-3355

————————

UNITED STATES OF AMERICA,
*Appellee*,

—v.—

Tibor Klein,
*Defendant*,

ROBERT SCHULMAN,
*Defendant-Appellant*.

————————

Before: KATZMANN, *Chief Judge*, KEARSE and CHIN, *Circuit Judges*.

————————

Defendant-appellant Robert Schulman appeals from an October 4, 2017 judgment convicting him, following a jury trial, of one count of conspiracy to commit securities fraud and one count of securities fraud. On appeal, Schulman argues that the district court erroneously denied his motion pursuant to Federal Rule of Criminal Procedure 29 to vacate his convictions. According to Schulman,

1

his convictions cannot stand because the government adduced insufficient evidence at trial of his criminal intent. Because the jury was not required to credit Schulman's deposition testimony that he intended only to brag when he tipped his friend and financial advisor about an upcoming merger, and the evidence taken as a whole permitted the jury to find beyond a reasonable doubt that Schulman intended his communication to lead to trading in securities of the company in question, we disagree. Accordingly, we **AFFIRM** the judgment of the district court.

_____

MARK D. HARRIS (John E. Roberts, *on the brief*), Proskauer Rose LLP, New York, New York, *for Defendant-Appellant*.

DAVID C. PITLUCK, Assistant United States Attorney (Jo Ann M. Navickas and Julia Nestor, Assistant United States Attorneys, *on the brief*), *for* Richard P. Donoghue, United States Attorney for the Eastern District of New York, Brooklyn, New York, *for Appellee*.

_____

ROBERT A. KATZMANN, *Chief Judge*:

This securities fraud case calls upon us to review whether there was sufficient evidence of criminal intent to sustain a judgment of conviction against a tipper who did not directly trade on material, non-public information but rather shared it with a tippee who did. Robert Schulman appeals from a judgment entered October 4, 2017 in the United States District Court for the Eastern District of New York (Azrack, *J.*) convicting him, after a jury trial, of one

count of conspiracy to commit securities fraud, in violation of 18 U.S.C. § 371, and one count of securities fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff. The jury found, in relevant part, that Schulman engaged in a conspiracy to trade in the securities of a company called King Pharmaceuticals ("King") using material, non-public information that he obtained through his representation of King while a partner at the law firm of Hunton & Williams ("Hunton"). Schulman's sole contention on appeal is that the government adduced insufficient evidence at trial of his criminal intent.

Schulman's arguments focus on a comment Schulman says he made to his friend and financial advisor Tibor Klein: "[I]t would be nice to be king for a day." App. 251. Schulman concedes that, in making this comment, he "disclosed non-public information to a friend who was also his financial advisor." Appellant's Br. at 4. But, according to Schulman, his comment was merely a "joke," App. at 251, or, as he argues now, "a boastful, imprudent" remark, Appellant's Br. at 4. He contends that no reasonable jury could conclude beyond a reasonable doubt—in light of his testimony that he communicated nothing more about King or its ongoing merger talks, *see* App. at 252 ("I would have never told him . . .

3

there's a potential merger."); *id.* ("[T]hat's the extent of what I would have communicated to him.")—that he disclosed this information "with the expectation that [Klein would] trade on it," *United States v. Martoma*, 894 F.3d 64, 79 (2d Cir. 2017); *see also Salman v. United States*, 137 S. Ct. 420, 428 (2016).

We disagree. The evidence here, taken as a whole, is sufficient to support the jury's verdict. The jury was entitled to discredit Schulman's testimony in a prior deposition that he intended only to brag and that he told Klein nothing about King's ongoing merger talks. Extensive circumstantial evidence supports an inference that Schulman communicated more to Klein than that "it would be nice to be king for a day" and that Schulman expected Klein to use the non-public information he shared with him to trade in King securities. Accordingly, the judgment of the district court is **AFFIRMED**.

## BACKGROUND

On August 4, 2016, a grand jury in the Eastern District of New York charged Robert Schulman and Tibor Klein with securities fraud and conspiracy to commit securities fraud. On February 24, 2017, the district court granted

4

Klein's motion to sever his trial from Schulman's, and on March 6, 2017, Schulman's trial commenced. At trial, the Government introduced, *inter alia*, the testimony of a cooperating witness, Michael Shechtman; sworn statements Schulman made to the U.S. Securities and Exchange Commission ("SEC") in a deposition on August 27, 2012; and notes taken during Schulman's meeting with the U.S. Attorney's Office ("USAO") on May 19, 2015. Schulman called, among others, his wife, Ronnie Schulman. Neither Robert Schulman nor Klein testified at trial.

## I.    Trial Evidence

The evidence at trial included the following. Schulman was a Washington D.C.-based partner in Hunton's patent group. Klein was the principal of Klein Financial Services, a registered investment advisor based in Long Island, New York. In or about 2000, Schulman and his wife, Ronnie Schulman, hired Klein. The Schulmans gave Klein discretionary authority over their investment accounts, meaning that Klein could trade securities without first obtaining the Schulmans' permission. For his efforts, the Schulmans paid Klein one percent of

5

their portfolio per year, an arrangement akin to those Klein had with other clients.

Approximately three times each year, Klein traveled to the Schulmans' home in McLean, Virginia to discuss the Schulmans' finances. On these occasions, Klein arrived Friday afternoon, visited with Ronnie Schulman before Robert Schulman got home from work, and then had dinner with the Schulmans. After dinner, the Schulmans and Klein discussed the Schulmans' investment accounts, including, albeit "very rarely," individual stocks. App. at 805. Klein then spent the night in the Schulmans' guest room.

The Schulmans and Klein had become friends. As Ronnie Schulman explained, although her husband was "not close with Tibor in the personal way that I was," her husband and Klein went to baseball games, went out to dinner when Schulman travelled to New York for business, and would share a beer or glass of wine. *Id.* at 821. The Schulmans also introduced Klein to their friends, who subsequently also invested with Klein.

The Schulmans were "generally pleased" with Klein's services, although they were concerned that Klein had been too "bearish" in the years following the

6

2008 financial crisis. *Id.* at 241. The jury also learned that, in April, May, and June 2010, Klein made several purchases of Enzo Pharmaceuticals ("Enzo") in Schulman's IRA account. Enzo was Schulman's client at the time, and Klein knew that. When Schulman was asked about these trades by the SEC in 2012, he said that he "remember[ed] being a little upset" at Klein when Klein told him about these purchases, "because . . . the CEO [of Enzo] is a certifiable lunatic." *Id.* at 245. He added: "I remember being a little upset, but I don't remember what happened with that. I think he sold it at some point after that." *Id.* Several years later, in 2015, when Schulman was asked about these trades by the USAO he said that he believed "it was improper . . . to own shares in a client" and that he "reprimanded Klein not to [trade in securities of his clients] in the future." *Id.* at 242.

Schulman's convictions relate to his representation of King. In July 2010, Schulman was preparing for summary judgment and trial in a patent lawsuit involving King, when King's in-house counsel informed another Hunton partner that King was looking to settle the case and that King was in merger discussions with Pfizer. On August 4, 2010, that partner and another Hunton lawyer, David

7

Kelly, met with Pfizer's lawyers in New York as part of Pfizer's due diligence.

Thereafter, Schulman learned of the potential merger from Kelly. Kelly told

Schulman to keep the information confidential.

Less than ten days later, on Friday, August 13, Klein traveled to the

Schulmans' home in Virginia for one of their regular meetings. Klein arrived in

the afternoon, had dinner with the Schulmans, spent the night in their guest

room, and departed the next morning. Schulman, in his SEC deposition,

admitted to telling Klein about King. Specifically, Schulman said:

> [T]here was one evening when Mr. Klein was at my house where I did
> mention, and I kind of made a joke with him, "boy, it would be nice to be
> king for a day." And I made some joke with him about that. And at that
> point I would have never told him anything about their meeting, there's a
> potential merger, it would have been much more of the nature of "hey,
> wouldn't it be great to be king for a day, ha, ha, ha," kind of like telling
> him, like acting like I am a big shot and I know this thing. But that's the
> extent of what I would have communicated to him.

*Id.* at 251-52. Schulman provided a similar explanation to the USAO in his 2015

interview. *Id.* at 240-41.

Ronnie Schulman, the only person to testify at trial who was present that

evening, said that she could not remember anything being said about King. In

particular, Ronnie Schulman said that she did not hear her husband say, "I'd like to be king for a day," but that, even if he had said it, she may not have picked up on it as significant because it would have just been "silly talk." *Id.* at 831-32.

On Sunday, August 15, Klein called Shechtman, his childhood best friend, and a financial advisor at Ameriprise Financial ("Ameriprise"), but could not reach him. The next day, Klein reached Shechtman and asked him what he would do if he thought he had inside information. Shechtman asked Klein what he was talking about. Klein said: "Pfizer's buying King Pharmaceuticals." *Id.* at 335. Shechtman asked Klein if he had spoken to Frank Marzano, one of Klein's former colleagues, about King, and Klein told Shechtman that Marzano "wouldn't touch this." *Id.* at 337-38. Shechtman did not ask Klein about the source of his information because he "didn't want to know the answers." *Id.* at 336. Klein did not mention any publicly available information that might justify purchasing King securities at the time he initially shared the material, non-public information with Shechtman.

Shechtman then purchased $15,000 of King options, some expiring September 18, 2010 and some expiring October 16, 2010. Shechtman also

purchased $45,000 of King stock for himself and his wife. Klein purchased 65,150 King shares for $585,217 in various accounts including accounts belonging to him, the Schulmans, and forty-eight clients, including the Schulmans' friends and Klein's parents. Klein's purchases for the Schulmans totaled $26,899, 7.35 percent of Robert Schulman's IRA.

On October 12, 2010, Pfizer announced its acquisition of King. Shechtman immediately sold his King stock and options, for a profit of more than $110,000. Klein sold his King stock for a profit of approximately $8,000, and the King stock he had purchased for his family and clients for a profit of $328,038. Schulman's share of these profits was around $15,500, an over 50 percent return in less than two months.

A few weeks later, an Ameriprise compliance officer approached Shechtman, telling him there was a serious problem. When Shechtman heard this, he "went numb," because he "immediately knew it was about the trades." *Id.* at 366. At first, Shechtman lied, saying that he had been looking at King for a while and had spoken with some fellow advisors about King who thought it was a good investment. Later, Shechtman sent an email to Ameriprise compliance

officers disclosing that he had spoken with Klein about King, in case investigators noticed his numerous phone calls with Klein. A week later, Shechtman told Klein about the Ameriprise investigation. As Ameriprise had asked Shechtman for information backing up his story, such as research reports or notes, Klein sent an email to a "junk email" address shared by Shechtman and his wife containing some research about King. Around this time, Klein also sold all of Schulman's Enzo shares.

Following an investigation, the SEC charged Shechtman and Shechtman admitted liability. Shechtman also agreed to cooperate with the USAO and to plead guilty to conspiracy to commit securities fraud. The SEC then charged Klein in the fall of 2013, at which point the Schulmans fired Klein. Ronnie testified that she and her husband had not fired Klein earlier, for example, after learning that Klein had traded in King securities in their accounts or after Robert was deposed by the SEC, because they "trusted" Klein and "believed there was an innocent explanation" for all that had happened. *Id.* at 839-40.

## II. Post-Trial Proceedings

11

Schulman moved for a judgment of acquittal after the government rested, arguing, among other things, that the evidence did not establish that he intended for Klein to trade in King securities. The district court denied Schulman's motion. Schulman renewed his motion for a judgment of acquittal at the conclusion of the evidence, and the district court again denied the motion. Thereafter, the district court charged the jury, and, a little over a day later, the jury returned guilty verdicts on both counts.

Schulman then moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. Schulman argued, *inter alia*, that no reasonable jury could have inferred that he told Klein more than the "king for a day" comment and that no reasonable jury could have found that he had intended Klein to trade on it. The district court denied Schulman's motion by reasoned opinion. Thereafter, the district court sentenced Schulman on both counts to three years' probation to run concurrently, a $50,000 fine, forfeiture in the amount of $15,527, and 2,000 hours of community service. This appeal timely followed.

## DISCUSSION

We review *de novo* a district court's order denying a Rule 29 motion addressing the sufficiency of the evidence. *United States v. Khalil*, 857 F.3d 137, 139 (2d Cir. 2017). In challenging the jury's verdict, a Rule 29 movant "bears a heavy burden." *Martoma*, 894 F.3d at 72.[1] A reviewing court must "credit[] every inference that could have been drawn in the government's favor," *id.*, and "affirm the conviction so long as, from the inferences reasonably drawn, the jury might fairly have concluded guilt beyond a reasonable doubt." *United States v. Reifler*, 446 F.3d 65, 94 (2d Cir. 2006).

Moreover, in considering Schulman's sufficiency challenge, we do not evaluate the evidence piecemeal or in isolation. We view the evidence "in conjunction" and uphold Schulman's conviction "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* at 94-95; *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979). While "specious inferences are not indulged," *United States v. Lorenzo*, 534 F.3d 153, 159

---

[1] Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, footnotes, and citations are omitted.

(2d Cir. 2008), we "defer to the jury's determination of the weight of the evidence and the credibility of the witnesses, and to the jury's choice of the competing inferences that can be drawn from the evidence," *Reifler*, 446 F.3d at 94. In a close case, where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, [we] must let the jury decide the matter." *United States v. Autuori*, 212 F.3d 105, 114 (2d Cir. 2000).

In an insider trading case, the government must prove that the insider will personally benefit from the disclosure to the tippee. *See Martoma*, 894 F.3d at 73. Personal benefit can be established in a number of ways, including by illustrating the nature of the relationship between the tipper and the tippee or the tipper's receipt of something of value. The critical question regards the tipper's purpose: did the tipper share the material non-public information with the tippee intending that the tippee use the information to improperly trade in securities? *See id.* at 79 (a tipper is liable under 15 U.S.C. § 78j(b) if the tipper discloses material, non-public information "with the expectation that the tippee will trade on it"); *see also United States v. Gansman*, 657 F.3d 85, 92 (2d Cir. 2011) ("In prosecuting a putative 'tipper' under the misappropriation theory of insider

trading, the government must prove as an element of the offense that the tipper

conveyed material nonpublic information to his 'tippee' with the understanding

that it would be used for securities trading purposes.").[2] Schulman argues that

"[t]he Government presented no evidence [at trial], either direct or

circumstantial, that [he] intended for Klein to trade on" his tip about King.

Appellant's Br. at 26. According to Schulman, the evidence merely "suggests that

[he] made a misguided comment to a friend in an effort to show off that he knew

something that the public did not." *Id.* at 22.

We disagree. This is a case where it is essential to view the various pieces

of evidence together. Although Schulman told the SEC that he had

communicated "nothing" more than that he wished he could be king for a day,

App. at 240—a comment that, by itself, is innocuous—the jury was entitled to

disbelieve that he communicated nothing more. The district court properly

---

[2] As relevant here, 15 U.S.C. § 78j(b) prohibits the use of "any manipulative or deceptive device or contrivance" to contravene an SEC rule, including Rule 10b-5. *See* 17 C.F.R. § 240.10b-5. Rule 10b-5 bars "undisclosed trading on inside corporate information by individuals who are under a duty of trust and confidence that prohibits them from secretly using such information for their personal advantage." *Salman v. United States*, 137 S. Ct. 420, 423 (2016). "These persons also may not tip inside information to others for trading." *Id.*

instructed the jury to draw "reasonable inferences," *id.* at 1290, and "us[e] common sense," *id.* at 1317. As a matter of common sense, Schulman had to have communicated additional information for Schulman to concede to the SEC that his king-for-a-day comment was in fact "a reference to King Pharmaceuticals," *id.* at 241. An oral statement does not usually reflect capitalization. Nonetheless, Klein apparently recognized that by "king" Schulman meant "King." Common sense also would lead a rational juror to conclude that Schulman had to have communicated additional information to Klein for Klein to have promptly called Shechtman, cited "inside information" about King and Pfizer, *id.* at 335, and begun buying King stock. Indeed, this precise issue was argued to the jury, *see id.* at 1231-32, 1265, and was resolved by the jury against Schulman.

Further, the trial record is replete with evidence supporting an inference that Schulman told Klein information about King so that Klein would trade on it. For example, a reasonable jury could infer that Schulman intended Klein to trade from the evidence that (1) Klein was Schulman's money manager, with discretionary authority over Schulman's accounts, and that Schulman told Klein about King during a meeting to discuss his investment portfolio; (2) after

16

meeting with Schulman, Klein immediately bought hundreds of thousands of dollars of King stock, including in Schulman's account and in the accounts of Schulman's friends; and (3) Klein, on behalf of Schulman, had previously purchased stock in one of Schulman's clients, Enzo.

We reject Schulman's arguments that Klein's role as his financial advisor, and Klein's conversations with Shechtman and purchases of King stock following the meeting with Schulman are irrelevant. A rational jury could infer from the fact that Klein managed Schulman's money and worked as a professional stock trader that Schulman intended Klein to trade on a stock tip he shared with him. The fact that Klein and Schulman were also close friends does not detract from the relevance of Klein's profession; in fact, it supplies an additional motive for Schulman's tip. Similarly, a rational jury could infer from the fact that Klein purchased hundreds of thousands of dollars in King securities immediately after meeting with Schulman, including over twenty-five thousand dollars of King stock in Schulman's account, that Klein was acting in accordance with Schulman's intent. This is true even though there were "virtually no communications" between Schulman and Klein in the months following

17

Schulman's disclosure. Appellant's Br. at 29. The jury was not required to accept Schulman's contrary interpretation of the facts—that Klein's purchase of stock for Schulman was reckless and unthinking—as there is ample evidence in the record that Klein behaved in a calculated manner in trading on the information about King.

We also reject Schulman's argument that Klein's prior purchase of Enzo stock is irrelevant. A reasonable jury could infer from the fact that Klein had once traded in the stock of Schulman's clients that he might be expected to do so again. And, as Schulman was aware of Klein's trading in Enzo, the jury could further infer that when Schulman told Klein about King, he expected Klein to act on the information. In making these inferences, a reasonable jury could consider Schulman's varying explanations for his disapproval of Klein's prior purchase of Enzo stock. Specifically, when Schulman was first interviewed by the SEC in 2012, he testified, "I remember being a little upset at [Klein for buying Enzo stock,] because I think that the CEO [of Enzo] is a certifiable lunatic." App. at 245. But several years later, Schulman told the USAO that the reason he criticized Klein for buying Enzo stock was that it was improper to own shares of a client.

*See id.* at 242. The jury could reasonably view Schulman's second explanation as a conscious attempt to sanitize his first explanation, which had criticized only the economic soundness of the investment, not its legality or propriety.

In addition, Schulman's first, and perhaps more genuine explanation, provides further context for the king-for-a-day comment. For example, the jury could reasonably infer from the Enzo evidence that, while Klein knew that Schulman had been upset at him for buying Enzo shares because the CEO was a "lunatic," Klein understood that Schulman's stating a wish to be "[K]ing for a day" meant that buying King shares was, in fact, given Schulman's inside information, a good idea.

In this regard, it is also relevant that Schulman thought that Klein's investments in 2009 and 2010 had been "too bearish," *id.* at 241, since Schulman's desire to invest more aggressively, along with his view of Klein's Enzo purchase as unwise, could be viewed as fueling a desire by Schulman to help Klein achieve greater returns in Schulman's portfolio. And while Schulman argues that $15,000 was so insignificant a fraction of his overall net worth that it could not have been an incentive for him to tip Klein, that sizable net worth entitled the jury to

19

disbelieve Schulman's preferred explanation that he made his king-for-a-day comment simply to "show off." Appellant's Br. at 22.

Finally, Schulman contends that he is entitled to a judgment of acquittal because the evidence supporting the inference that he intended Klein to trade on his tip about King is, at the very least, in equipoise with evidence supporting an inference that he intended merely to boast. But it is not. Schulman cites mainly the absence of evidence of any follow-up conversations with Klein. This absence of evidence at best supports an inference that Schulman did not intend for Klein to trade for Schulman's benefit. It says little, if anything, about whether Schulman intended Klein to trade for *Klein's* benefit, an independent basis upon which a rational jury could have found Schulman guilty.[3] Moreover, we know of no requirement in insider trading law that the government adduce evidence of multiple conversations between co-conspirators, or that the government provide direct testimonial evidence regarding a defendant's intent. *See Lorenzo*, 534 F.3d

---

[3] The Government argued at trial that *Martoma*'s "personal benefit" requirement was satisfied both because Schulman intended to receive a financial benefit and because Schulman intended to make a "gift" to Klein. The district court instructed the jury on both theories.

at 159 (the government "is entitled to prove its case solely through circumstantial evidence").

## CONCLUSION

After conducting an independent review of the record and considering the evidence as a whole, we conclude that a rational trier of fact could have found that Schulman acted with the requisite intent beyond a reasonable doubt. We have considered all of Schulman's contentions on appeal and have found in them no basis for reversal. Accordingly, the judgment of the district court is

**AFFIRMED**.