Larry BELENKE et al., Petitioners,

v.

SECURITIES AND EXCHANGE
COMMISSION, Respondent.

Chicago Board Options Exchange, Inc.,
Intervening-Respondents.

No. 79–1118.

United States Court of Appeals,
Seventh Circuit.

Argued June 13, 1979.

Decided Sept. 27, 1979.

David V. Kahn, Chicago, Ill., for petitioners.

Eric D. Roiter, Securities & Exchange Commission, Washington, D. C., for respondent.

Burton Rissman, Chicago, Ill., for intervening-respondents.

Before SWYGERT, and CUMMINGS, Circuit Judges, and CAMPBELL, Senior District Judge.*

SWYGERT, Circuit Judge.

This is a proceeding on a petition for review of an order of the Securities and Exchange Commission ("SEC") entered January 11, 1979 approving an amendment to the rules of the Chicago Board Options Exchange, Inc. ("CBOE") pursuant to section 19(b) of the Securities Exchange Act of

---

* The Honorable William J. Campbell, United States Senior District Judge for the Northern District of Illinois, sitting by designation.

1934, as amended. 15 U.S.C. § 78s(b). Petitioners are eighteen members of the CBOE appointed to serve as board brokers who have joined together as the Board Brokers Association ("BBA") to pursue this claim. They contend that the order must be set side because the SEC failed to follow the appropriate procedures when it approved the amendments to the CBOE's rules and because these amendments are inconsistent with the requirements of the Act.

The CBOE was organized in 1973 as a Delaware nonstock corporation to provide an exchange on which options contracts in various common stocks could be traded. As a securities exchange, it is subject to the self-regulatory responsibilities imposed by the Securities Exchange Act of 1934, primarily under section 6(b). 15 U.S.C. § 78f(b).

Prior to the approval of the proposal question, the members of the CBOE could act in one of three capacities: as a market maker, a floor broker, or a board broker. A market maker buys and sells options strictly for his own account, whereas a floor broker acts solely as an agent, earning commissions by executing orders for others. A member can be registered both as a market maker and as a floor broker but cannot act as both with respect to the same underlying security on the same business day. A board broker also performs functions as an agent, but deals only in specified classes of options for which he has been given an exclusive appointment to maintain the public limit order book. A "limit order" is an order to buy or sell an option at a specified price in contrast to a "market order" to buy or sell at the prevailing price. If the prevailing price and the specified price differ, a limit order cannot be executed immediately. Rather than hold a limit order indefinitely, the floor brokers may, for a fee, place such orders in the board broker's book to be executed when the specified price is reached. Orders placed in these books have priority over other orders at the same price.

With the goal of achieving maximum efficiency in the maintenance of its public limit order books, the CBOE submitted a proposal to the SEC on July 28, 1978. The proposal involved replacing the board brokers with CBOE employees, Order Book Officials ("OBOs"), compensated at a fixed rate. The CBOE believed that such direct control over this service would better meet the needs of its member firms and their customers. More specifically, under the plan the CBOE would be able to take action against those OBOs with insufficient staff and to transfer option classes from one OBO to another to accommodate flow stress or floor congestion. The board broker system provided the CBOE with little flexibility to take such action.

Upon the filing of the CBOE rule changes, the SEC, pursuant to section 19(b)(1) of the Act, provided notice and the opportunity for written comment on the proposals. The BBA filed extensive written comments in opposition to the proposals, in which they raised many of the objections they raise in this petition. The BBA contended that the Securities Exchange Act prohibited the CBOE from maintaining an OBO-type plan; that the plan would reduce the efficiency of floor transactions and compromise the self-regulatory responsibilities of the CBOE; and that the proposals would frustrate competition and unfairly discriminate against CBOE members acting as board brokers. The BBA also asserted that the proposal constituted the fixing of commission rates thereby requiring hearings pursuant to section 6(e) of the Act prior to their approval.

After consideration of the proposal and the written comments submitted regarding it, the SEC concluded that the amendments to the CBOE's rules were consistent with the requirements of the Securities Exchange Act. Accordingly, on January 11, 1979, the SEC issued an approval order pursuant to section 19(b)(2).[1] This order

1. Petitioners' description of this entire process in their statement of facts is that "[t]he Commission, on January 11, 1979, refusing to insti-

tute any disapproval proceedings or grant petitioners any hearing whatsoever to substantiate their objections to the OBO plan, instead ap-

determined, with supporting reasoning, that nothing in the Act prohibited the plan; that the proposal did not trigger the procedural requirements of section 6(e); that it would not reduce the CBOE's self-regulatory capacity; that it would not unfairly discriminate against board brokers; and that the plan would not impose inappropriate burdens upon competition.

Petitioners challenge the legality of the SEC order on both procedural and substantive grounds. According to petitioners, the Commissioner erred in failing both to conduct a hearing concerning the proposal which they argue was required by sections 6(e) and 19(b)(2)(B) of the Securities Exchange Act and to determine independently whether the OBO plan was consistent with the purposes of the Act. Petitioners also contend that the order is substantively defective because it is based on the SEC's finding that the OBO plan will not impose any inappropriate burden on competition but may, in fact, enhance competition. Petitioners allege that this finding is arbitrary and capricious and not supported by substantial evidence. Petitioners further contend that the Act does not permit use of an OBO system. Finally, they question the Commission's authority to · determine whether their individual legal rights have been violated.

■ Petitioners contend that under section 6(e) of the Securities Exchange Act a full hearing (not conducted here) is a condition precedent to SEC approval of these amendments to the CBOE rules. Section 6(e) governs SEC approval of proposed rule changes which would impose a schedule for or fix rates of commissions or other fees to be charged by members of a national securities exchange for effecting transactions on

the exchange. Section 6(e)(1) of the Act requires the SEC to make certain specified findings prior to "imposing or fixing any schedule of commissions, allowances, discounts, or other fees to be charged by its members for acting as broker[s] on the floor of the exchange or as odd-lot dealers." 15 U.S.C. § 78f(e)(1). Similarly, section 6(e)(4) mandates that if a fixed schedule is imposed for fees "to be charged by its members for effecting transactions on such exchange," the SEC must afford an opportunity for an oral hearing. 15 U.S.C. § 78f(e)(4). Petitioners contend that the OBO system, which contemplates specified rates for OBO services, is a fixed fee schedule under the terms of section 6(e) and, therefore, that the SEC was unauthorized to approve the OBO plan without a full hearing.[2]

The SEC in its order approving the OBO plan concluded that section 6(e) was inapplicable to the proposal since fees for limit order services will be assessed by and paid to the exchange itself, not the CBOE's members. In order to circumvent this conclusion, petitioners argue, based on statutory definitional language, that the CBOE employees, when acting in their order book capacity, are "members" of the exchange for purposes of section 6(e). Thus, when the exchange sets the fees which it collects for the services of the OBOs, petitioners contend, these fees are fixed fees charged by a "member" of an exchange within the meaning of section 6(e). This position requires a strained interpretation of the statutory language of the Securities Exchange Act which we are unwilling to accept.

We note initially that this is the third OBO-type plan which the SEC has approved. It its prior approvals the SEC

proved the rules changes in a summary proceeding (Rec. doc. 18, R282)." Brief of Petitioners at 17. The SEC approval order (the written culmination of this "summary proceeding") is a twenty-four page, single-spaced, typewritten document addressing the issues relevant to these rules changes including, specifically, the objections raised by the BBA's written comments.

2. The order petitioners seek to have reviewed does not approve a schedule of rates for OBO service, but merely provides that charges may be imposed by the exchange under existing CBOE rules. Nevertheless because the SEC order addressed the question of section 6(e)'s applicability to fixed rates for OBO services and a proposed OBO fee schedule has since been filed with the Commission, we see no reason to postpone resolution of this issue.

characterized the OBOs as exchanged employees, not as members of the exchange. And statutory interpretations by the agency entrusted with the administration of a statute are entitled to deference from the courts. *See, e. g., E. I. DuPont de Nemours & Co. v. Collins,* 432 U.S. 46, 54–55, 97 S.Ct. 2229, 53 L.Ed.2d 100 (1976); *Saxbe v. Bustos,* 419 U.S. 65, 74, 95 S.Ct. 272, 42 L.Ed.2d 231 (1974).

Petitioners' interpretation ignores a clear distinction between "exchange" and "member" inherent in the Act. Section 6(e) itself limits the conditions under which an "exchange" can set fees to be charged by its "members"; the juxtaposition and usage of these two terms evidences that Congress did not contemplate an exchange being a member of itself. And the provision of services (like those provided by the OBOs) does not dissolve an exchange's status as such. Section 3(a)(2) of the Act indicates that Congress anticipated that exchange facilities would provide services "for the purpose of effecting or reporting a transaction on an exchange . . . ." 15 U.S.C. § 78c(a)(2). The services provided under the OBO plan fall within the statutory framework as a service provided by an exchange, not by a member of an exchange. And the fees charged by the exchange for the limit order services are fees assessed by an exchange, not a commission charged by a member of the exchange.[3] In its introductory language to the definitions in section 3(a) (the section containing the definitions, *inter alia,* of "exchange" and "member"), Congress stated that the definitions were to be used "unless the context otherwise requires . . . ." 15 U.S.C. § 78c. *See CNS Enterprises, Inc. v. G & G Enterprises, Inc.,* 508 F.2d 1354, 1357 (7th Cir. 1975). To the extent that the definitions contained in this section lead to the conclusion that by establishing an OBO plan the CBOE has become a member of itself, "the context otherwise requires." That conclusion requires a strained interpretation of the statutory language and conflicts with both the common sense meaning of the

terms and their meaning in the context of the entire statutory scheme. The CBOE (and its employees) is not a member of itself and the set fees charged for OBO services do not require application of the section 6(e) hearing requirements prior to approval of the OBO plan.

The procedural requirements applicable to the SEC approval of the OBO plan are set out in section 19(b) of the Securities Exchange Act. These procedures were followed by the SEC.

Section 19(b) requires only informal proceedings for SEC review of rule changes of national securities exchanges and other self-regulating organizations. Section 19(b) states:

The Commission shall, upon the filing of any proposed rule change, publish notice thereof together with the terms of substance of the proposed rule change or a description of the subjects and issues involved. The Commission shall give interested persons an opportunity to submit written data, views, and arguments concerning such proposed rule change. No proposed rule change shall take effect unless approved by the Commission or otherwise permitted in accordance with the provisions of this subsection.

\*　\*　\*　\*　\*　\*

The Commission shall approve a proposed rule change of a self-regulatory organization if it finds that such proposed rule change is consistent with the requirements of this title and the rules and regulations thereunder applicable to such organization.

15 U.S.C. § 78s(b). *See Bradford National Clearing Corp. v. SEC,* 191 U.S.App.D.C. 383, 391–92, 590 F.2d 1085, 1093–94 (D.C. Cir. 1978). It is only when the SEC determines that proposed rule changes are inconsistent with the Act (the opposite conclusion was reached here) that an opportunity for a hearing is required. § 19(b)(2)(B); 15 U.S.C. § 78s(b)(2)(B). Although Congress imposed a requirement for formal hearings

---

**3.** Fees assessed by an exchange (the situation presented here) are regulated by sections 6(b)(4) and 19(b)(3)(A), (C) of the Securities Exchange Act.

in several areas of SEC decision making, *see, e. g.,* §§ 11A(c)(3)(A), 19(c), 19(g); 15 U.S.C. §§ 78k–1(c)(3)(A), 78s(c), 78s(g), it designed section 19(b)(2) to "give the SEC sufficient flexibility to fashion a proceeding appropriate to the particular self-regulatory proposal being considered. In many, perhaps most, situations, notice and an opportunity for written comment would be sufficient . . . ." S.Rep. No. 94–75, 94th Cong., 1st Sess. 30 (1975) U.S.Code Cong. & Admin.News 1975, pp. 179, 208. The SEC followed the approval procedures required by section 19(b). *See supra,* 195. Under the circumstances of this case, no more was required.

■ Petitioners contend that the SEC violated the procedures required by the Securities Exchange Act by failing to make an independent determination that the OBO rules were consistent with the requirements of the Act. The SEC approval order, to which petitioners give such short shrift, *see supra* 195–196 n.1, belies this argument. The Order responds to the written objections submitted by petitioners and explains its finding that the proposed rule changes were consistent with the terms of the Act, with particular reference to sections 6(b)(1), 6(b)(5), 11A(a)(1)(C)(i), 11A(a)(1)(C)(ii) and 19(g)(1) of the Act.

■ Petitioners also argue that the "record" before the SEC did not contain "substantial evidence" to support its decision—that the factual premises were inadequate for the SEC's conclusion. This argument ignores the character of the procedures Congress established for SEC review of rule changes proposed by self-regulatory organizations. A detailed factual record is not required in this context. As the District of Columbia Circuit stated:

> The drafters of the 1975 Amendments, in discussing the judicial review function, and specifically the duty to subject the SEC's "factual premises" to careful inquiry, realized that "the exercise of . . quasi-legislative functions . . . may be based upon policy considerations and administrative expertise which cannot be reduced to specific evidentiary facts." [S.Rep. No. 94–75, *supra,* at 37.]

*Bradford, supra,* 191 U.S.App.D.C. at 402, n.30, 590 F.2d at 1104, n.30. The SEC was not required to develop a record not contemplated by the statute prior to approving the OBO plan. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.,* 435 U.S. 519, 547, 98 S.Ct. 1197, 55 L.Ed.2d 460 (1978).

■ Finally, petitioners contend that their argument that the OBO proposal will produce anticompetitive effects required the SEC to follow a more exacting procedural formula prior to approving the OBO plan. This argument has little support in the Act. And petitioners' suggestion violates the Supreme Court's admonition in *Vermont Yankee* that reviewing courts should be hesitant to impose more procedural requirements than found in the authorizing statute or adopted by the administrative agency. *Id.* at 524, 98 S.Ct. 1197. Further, petitioners' argument implies that any time an allegation of anticompetitive effect is made in an administrative proceeding, the agency would be required to conduct elaborate hearings prior to making a decision. This result has been rejected by the Supreme Court. *See Gulf States Utilities Co. v. Federal Power Comm.,* 411 U.S. 747, 762, 93 S.Ct. 1870, 36 L.Ed.2d 635 (1973). And since the SEC is required to consider the potential anticompetitive effects of every rule change proposed by an exchange, *see,* § 6(b)(8), 15 U.S.C. § 78f(b)(8), petitioners' argument would lead to hearings on every exchange proposal—a result which is inconsistent with the carefully specified procedural requirements of the Act. Thus, while we must scrutinize closely the SEC's substantive determination that the OBO proposal does not unduly burden competition, *see Gulf States, supra,* 411 U.S. at 763, 93 S.Ct. 1870, we are unwilling to conclude that petitioners' allegations about the anticompetitive effects of the proposal necessitate more elaborate procedural niceties than were offered here.

Petitioners' principal substantive objections to the SEC's approval order focus on the SEC's conclusions that the potential

anticompetitive effects of the OBO proposal do not warrant its rejection and that the OBO plan is not prohibited by the terms of the Securities Exchange Act. The scope of our review of these SEC determinations is limited. Section 25(a)(4) of the Securities Exchange Act provides that the "findings of the Commission as to the facts, if supported by substantial evidence, are conclusive." 15 U.S.C. § 78y(a)(4). The "quasi-legislative," policy-oriented, aspects of the SEC approval order can be overturned only if they are arbitrary, capricious, or an abuse of discretion. *Bradford, supra,* 191 U.S. App.D.C. at 391–92, 590 F.2d at 1093–94. *See also, Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). And where an agency is required to make predictive, policy-oriented determinations, as here, judicial deference to the expertise of the agency is particularly appropriate. *See Federal Communications Commission v. National Citizens Committee for Broadcasting,* 436 U.S. 775, 814, 98 S.Ct. 2096, 56 L.Ed.2d 697 (1978); *Bradford, supra,* 191 U.S.App.D.C. at 402, 590 F.2d at 1104.

■ Petitioners contend that the SEC's conclusion that the OBO plan will not create inappropriate or unnecessary burdens on competition was arbitrary, capricious and an abuse of discretion. We do not agree. Section 19(b)(2) of the Securities Exchange Act provides that:

> The Commission shall approve a proposed rule change of self-regulatory organization if it finds that such proposed rule change is consistent with the requirements of this chapter and the rules and regulations thereunder applicable to such organization. The Commission shall disapprove a proposed rule change of a self-regulatory organization if it does not make such findings.

15 U.S.C. § 78s(b)(2). Section 6(b) of the Act sets out some of the requirements applicable to exchanges. 15 U.S.C. § 78f(b)(1)–(8).[4]

4. Section 6(b) provides:

(b) An exchange shall not be registered as a national securities exchange unless the Commission determines that—

(1) Such exchange is so organized and has the capacity to be able to carry out the purposes of this chapter and to comply, and (subject to any rule or order of the Commission pursuant to section 78q(d) or 78s(g)(2) of this title) to enforce compliance by its members and persons associated with its members, with the provisions of this chapter, the rules and regulations thereunder, and the rules of the exchange.

(2) Subject to the provisions of subsection (c) of this section, the rules of the exchange provide that any registered broker or dealer or natural person associated with a registered broker or dealer may become a member of such exchange and any person may become associated with a member thereof.

(3) The rules of the exchange assure a fair representation of its members in the selection of its directors and administration of its affairs and provides that one or more directors shall be representative of issuers and investors and not be associated with a member of the exchange, broker, or dealer.

(4) The rules of the exchange provide for the equitable allocation of reasonable dues, fees, and other charges among its members and issuers and other persons using its facilities.

(5) The rules of the exchange are designed to prevent fraudulent and manipulative acts and practices, to promote just and equitable principles of trade, to foster cooperation and coordination with persons engaged in regulating, clearing, settling, processing information with respect to, and facilitating transactions in securities, to remove impediments to and perfect the mechanism of a free and open market and a national market system, and, in general, to protect investors and the public interest; and are not designed to permit unfair discrimination between customers, issuers, brokers, or dealers, or to regulate by virtue of any authority conferred by this chapter matters not related to the purposes of this chapter or the administration of the exchange.

(6) The rules of the exchange provide that (subject to any rule or order of the Commission pursuant to section 78q(d) or 78s(g)(2) of this title) its members and persons associated with its members shall be appropriately disciplined for violation of the provisions of this chapter, the rules or regulations thereunder, or the rules of the exchange, by expulsion, suspension, limitation of activities, functions, and operations, fine, censure, being suspended or barred from being associated with a member, or any other fitting sanction.

(7) The rules of the exchange are in accordance with the provisions of subsection (d) of this section, and in general, provide a fair procedure for the disciplining of mem-

Other requirements are set out in the Congressional findings of section 11A(a)(1) of the Act:

(a)(1) The Congress finds that—

(A) The securities markets are an important national asset which must be preserved and strengthened.

(B) New data processing and communications techniques create the opportunity for more efficient and effective market operations.

(C) It is in the public interest and appropriate for the protection of investors and the maintenance of fair and orderly markets to assure—

(i) economically efficient execution of securities transactions;

(ii) fair competition among brokers and dealers, among exchange markets, and between exchange markets and markets other than exchange markets;

(iii) the availability to brokers, dealers, and investors of information with respect to quotations for and transactions in securities;

(iv) the practicability of brokers executing investors' orders in the best market; and

(v) an opportunity, consistent with the provisions of clauses (i) and (iv) of this subparagraph, for investors' orders to be executed without the participation of a dealer.

15 U.S.C. § 78k–1. These statutory provisions clearly indicate that the enhancement of competition is only one of many Congressional goals exchange regulations are required to pursue. *See Gordon v. New York Stock Exchange, Inc.,* 422 U.S. 659, 689, 95 S.Ct. 2598, 45 L.Ed.2d 463 (1975); *Bradford, supra,* 191 U.S.App.D.C. at 403, 590 F.2d at 1105. And the legislative history to the 1975 Amendments to the Securities Exchange Act makes explicit Congress' intent that competitive impact be one factor among many to be considered in making regulatory decisions and that the goal of enhancing competition should not become "paramount to the great purposes of the Exchange Act." S.Rep. No. 94–75, *supra,* at 13–14.

Given these Congressionally articulated priorities, petitioners' contention that the SEC's order was arbitrary and capricious with respect to the competition issue is untenable. The order fulfilled its statutory responsibility by analyzing the OBO proposal and demonstrating that specific statutory purposes would be served by it. *See, supra,* 198. For example, the SEC order stated:

The Commission finds that the CBOE's proposal to assume responsibility for maintenance of the limit order book as an Exchange-offered service should enable the Exchange to standardize further the operation of all limit order books, to deploy its employees efficiently from stations of light volume to stations of heavy volume in response to shifting market conditions and to hire additional staff to meet additional market demands.

*SEC Approval Order,* p. 14. And the SEC balanced the goal of competition with other goals that would be served by the proposal—which is all that is required by section 6(b)(8), the most specific statutory requirement regarding competition:

The Commission believes that the CBOE proposal does not impose any burden upon competition not necessary or appropriate in furtherance of the purposes of the Act, but rather furthers the public policy goals of enhancing the potential for competition among markets as set forth under the Act. To the extent that centralization of limit order book services in the CBOE may impose any specific burden on competition, the Commission finds that any potential anti-competitive effect is outweighed by the CBOE proposal's furtherance of the pur-

bers and persons associated with members, the denial of membership to any person seeking membership therein, the barring of any person from becoming associated with a member thereof, and the prohibition or limitation by the exchange of any person with respect to access to services offered by the exchange or a member thereof.

(8) The rules of the exchange do not impose any burden on competition not necessary or appropriate in furtherance of the purposes of this chapter.

poses of the Act in fostering economically efficient executions of securities transactions, and by enhancing the regulatory capabilities of the CBOE to monitor and enforce compliance by its members with the Act, rules thereunder, and rules of the Exchange.

*Id.* at 22.

Even if not imposing burdens on competition were an absolute requirement of the Act (which it is not) the SEC's conclusion that the OBO proposal, on balance, does not burden competition is neither arbitrary nor capricious. The SEC's conclusion that inter-exchange competition would be enhanced by permitting the CBOE to improve its limit order system (similar steps have already been taken by other exchanges) is neither arbitrary nor capricious. Contrary to petitioners' assertions "competition" can be promoted by permitting "a competitor" to improve its efficiency. And, given the limited scope of intra-exchange competition in the previous limit order system, the SEC's determination that the potential for competition will, on balance, be improved cannot be overturned. The SEC's determinations are not arbitrary and capricious and should be upheld.

■ Petitioners also argue that the Exchange Act prohibits the use of exchange employees to perform the limit order book functions and, therefore, the SEC order approving the OBO plan is arbitrary, capricious, and an abuse of discretion. We are unable to find any statutory authority for this proposition. The Act does not expressly limit the services an exchange may provide to its members and the investing public. Moreover the Senate Report on the 1975 Amendments to the Act reveals that the absence of such a provision was intentional. The Senate Committee explained that "the scope of the rule-making authority and responsibility of all self-regulatory organizations [is] defined in terms of purposes and standards rather than subject matters." S.Rep. 94–75, *supra*, at 27, U.S. Code Cong. & Admin.News 1975, p. 206.

Petitioners assert that the Act's prohibition of the use of OBOs can be inferred from the definitions of "exchange" and "facility" as set out in section 3. We cannot see how these definitions lead to petitioners' conclusion. An exchange is defined by section 3(a)(1) as:

. . . any organization, association, or group of persons, whether incorporated or unincorporated, which constitutes, maintains, or provides a marketplace or facilities for bringing together purchasers and sellers of securities . . . . .

15 U.S.C. § 78c(a)(1). The word "facility," as it relates to an exchange is defined in section 3(a)(2) to include:

. . . [the exchange's] premises, tangible, or intangible property whether on the premises or not, any right to use of such premises or property or *any service thereof for the purpose of effecting* or reporting *a transaction* on an exchange . . . ., and any right of the exchange to the use of any property or service.

15 U.S.C. § 78c(a)(2). (Emphasis added). The Act clearly anticipates that an exchange may provide services for the purpose of effecting transactions. Petitioners fail to point to anything in the statute that contradicts this apparent meaning or explains why this particular service cannot be provided by an exchange.

■ Petitioners assert that even if the Act does not absolutely prohibit use of an OBO system, the SEC should not have approved the plan because it conflicts with section 6(b)(1) of the Act which requires that a self-regulatory organization be structured to have the capacity "to enforce compliance by its members and persons associated with its members" with the Act, the SEC rules, and the exchange rules. Petitioners believe that the CBOE will have less incentive to supervise the OBOs because it will be receiving fees for their services. The Commission disagreed based on their experience in overseeing the CBOE since its inception. More specifically, the Commission noted that CBOE's self-regulatory capabilities had not been weakened in the past by its dependence upon trading volume for operating revenues. Further, the SEC previously has approved OBO systems for

two other stock exchanges and, apparently, has not seen evidence of petitioners' alleged dangers.

An agency's interpretation of a statute it is bound to enforce should be followed unless clearly incorrect. *See, e. g. DuPont, supra,* 432 U.S. at 54–55, 97 S.Ct. 2229. This is particularly true when the agency consistently has followed its interpretation of the statute. *See United States v. National Assoc. of Securities Dealers,* 422 U.S. 694, 719, 95 S.Ct. 2427, 45 L.Ed.2d 486 (1975). We conclude that the OBO proposal is not inconsistent with the terms of the Securities Exchange Act and that the SEC order approving the plan was not arbitrary or capricious.

Petitioners' final argument is that the SEC erred when it determined in its order that the OBO plan does not breach any fiduciary obligation owed to or contractual or vested rights held by petitioners. Petitioners contend that the SEC has no authority to make this determination and that the SEC's reliance on this determination in litigation before the Illinois courts violates their individual rights by precluding an independent adjudication of their claims by the courts. Petitioners, however, have offered no allegation that any opportunity for a hearing on their claims has been denied because of the SEC determinations. It is unclear what they would have this court do; we are not prepared to intervene in an Illinois proceeding to rule on this question. And perhaps more fundamentally, we are mindful of the United States Supreme Court's statement in *Silver v. New York Stock Exchange,* 373 U.S. 341, 350, 83 S.Ct. 1246, 10 L.Ed.2d 389 (1963) that the nation's securities markets are "affected with a public interest." The markets have powers and responsibilities defined by statute and we have concluded that the SEC did not violate these statutory directives when it approved the OBO plan.

We have considered all the other arguments advanced by petitioners and have concluded that they are meritless. The SEC abided by all the procedural requirements of the Act in its approval of the OBO plan. None of its substantive determinations was arbitrary or capricious.

Accordingly, the order of the Commission is affirmed.