# United States Court of Appeals
## For the First Circuit

No. 16-1579

UNITED STATES OF AMERICA,

Appellee,

v.

ROBERT H. BRAY,

Defendant, Appellant.


APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. William G. Young, U.S. District Judge]


Before

Howard, Chief Judge,
Souter, Associate Justice,*
and Stahl, Circuit Judge.


Mark C. Fleming, with whom Emily R. Schulman, Matthew T.
Martens, Daniel Winik, Alan E. Schoenfeld, Wilmer Cutler Pickering
Hale and Dorr LLP, Joseph W. Monahan III, and Monahan & Padellaro
were on brief, for appellant.
Eric P. Christofferson, Assistant United States Attorney,
with whom Stephen E. Frank, Assistant United States Attorney, and
William D. Weinreb, Attorney for the United States, were on brief,
for appellee.

---

*  Hon. David H. Souter, Associate Justice (Ret.) of the
Supreme Court of the United States, sitting by designation.

March 22, 2017

**STAHL**, **Circuit Judge**.  In what appears to be an ongoing trend, we again encounter a member of the Oakley Country Club ("Oakley"), a private institution located in Watertown, Massachusetts, answering to criminal securities fraud charges.[1] On this occasion, a jury convicted Robert Bray of illegal insider trading after he received material, nonpublic information about a local bank from a fellow Oakley member and then used that information to make a substantial trading profit.  On appeal, Bray insists that we set aside his conviction because the government presented insufficient evidence to support the jury's verdict. Bray also maintains that the trial court's instructions allowed the jury to convict him without finding that he possessed the necessary mental state.  See 15 U.S.C. § 78ff(a) (requiring the government to prove that a defendant "willfully" violated the securities laws in order to sustain a criminal conviction).  After careful review, we reject Bray's arguments and affirm his conviction.

## I.   Facts & Background

We recite the facts in the light most favorable to the jury's verdict, "reserving the detailed treatment of some points for later in this opinion."  McPhail, 831 F.3d at 3.  Bray and

---

[1] We have previously dealt with two criminal insider trading actions involving individuals belonging to the same country club. See United States v. McPhail, 831 F.3d 1 (1st Cir. 2016); United States v. Parigian, 824 F.3d 5 (1st Cir. 2016).

John Patrick O'Neill first met each other as members at Oakley, a private establishment that provides tennis, swimming, golf, and other social activities to its members.  Though the disparity in their respective golf skills meant Bray, a contractor and real-estate developer, and O'Neill, an executive at Eastern Bank ("Eastern"), rarely played together, the two men often socialized with each other in Oakley's pub room and dined on occasion with one another at nearby bars and restaurants.  Over time, Bray (or "Bubba," as O'Neill called him) got to know O'Neill's family as well. He took a particular liking to O'Neill's son, Matthew; for example, Bray gifted Matthew his first set of golf clubs as a child, attended his high school graduation party at O'Neill's house, and gave him a $1,000 check as a graduation present.  Bray later helped Matthew get an internship with an architect, hired Matthew to prepare architectural drawings for one of his own real-estate projects, and served as a reference when Matthew applied for a job at a restaurant.

Though Bray and O'Neill generally maintained a social relationship, the pair's discussions occasionally drifted toward their professional lives.  O'Neill, for instance, had some of Bray's associates refurbish the basement and roof at his house, while Bray often asked O'Neill for stock market and investment advice.  In particular, Bray leaned on O'Neill's professional experience and regularly asked him about "what bank stocks [he]

- 4 -

liked." O'Neill always answered these questions by advising Bray, based on publicly-available information, to invest in small community banks that were likely merger or take-over targets.

On June 13, 2010, however, O'Neill and Bray had a decidedly different conversation. While they were sitting together in the Oakley pub room, just the two of them, Bray said to O'Neill that he needed to make a "big score" in order to help fund one of his real estate projects (the "Watertown Project") and asked if O'Neill had any "bank stock tips" for him. According to O'Neill, Bray had never sought a "big score" from him before or, for that matter, requested advice based on an express need for money. O'Neill, as he had done in the past, rattled off the names of several local banks. However, this time O'Neill also took a napkin, penned the word "Wainwright" on it, and slid it across the bar toward Bray. As he did so, O'Neill told Bray that "[t]his could be a good one," or at least "something to that effect." Bray wordlessly took the napkin, slipped it into his pocket, and did not mention or ask about its contents for the rest of the night.

At the time, O'Neill knew that Wainwright Bank & Trust Co. ("Wainwright"), a local, publicly-traded bank, had put itself up for sale. This information was nonpublic and Eastern, O'Neill's employer, had told O'Neill to perform due diligence on Wainwright since it was a potential takeover candidate. Before starting that task, O'Neill had signed an agreement with Eastern that required

him to keep any nonpublic information he learned about Wainwright confidential. O'Neill did not explicitly inform Bray about this agreement or the source of his Wainwright tip.

When queried at trial as to why he had given Bray this tip, O'Neill answered:

> I don't know to this day, although I did want to help out Mr. Bray, he had done stuff for me in the past and for my family and here was an opportunity for me to return the favor. I looked up to Mr. Bray and I figured that doing this would enhance our relationship, he would think more highly of me.

Then, when questioned about whether he expected Bray to "return the favor" someday, O'Neill replied:

> Well, we're friends and that's what friends do, they take care of each other. I didn't expect anything at that exact time, but down the road he did offer me an interest in the Watertown project.

The day after receiving the tip, Bray called his broker, E*Trade, to place an order for 25,000 shares of Wainwright stock. Evidence at trial suggested that the size of Bray's trade was most unusual, as at the time of Bray's order, Wainwright was a "thinly-traded" stock with an average daily trading volume of around 1,000 to 2,000 shares. When an E*Trade representative pointed out Wainwright's relative illiquidity, Bray acknowledged that the trade might be "crazy." Nonetheless, Bray proceeded to place the order, though the broker did manage to convince him to structure

- 6 -

the trade as a limit order[2] which spread the trade's execution over multiple days. Over the next two weeks, Bray did two things. First, he liquidated a vast portion of his existing portfolio, generating approximately $555,000. Second, he bought 31,000 Wainwright shares, which amounted to 56% of the stock's total trading volume between June 14th and June 28th. By that point, Wainwright shares comprised around 57% of Bray's securities portfolio.

On June 29, 2010, Eastern publicly announced an agreement to acquire Wainwright for $19 per share, almost double the previous day's closing price. After the announcement, Bray met O'Neill in the Oakley parking lot, thanked him for the tip, and offered to "bring [O'Neill] into the Watertown project." Although Bray had never previously offered O'Neill an opportunity to invest in any of his real-estate projects, O'Neill nevertheless declined the invitation on this first opportunity. When Bray sold his shares under the terms of the acquisition agreement in November 2010, he netted approximately $300,000.

Before Bray sold his shares, O'Neill received an email from Eastern's legal department stating that the Financial Industry Regulatory Authority ("FINRA"), a non-governmental

---

[2] "A 'limit order' is an order to buy or sell [a security] at a specified price in contrast to a 'market order' to buy or sell at the prevailing price." Belenke v. SEC, 606 F.2d 193, 195 (7th Cir. 1979).

- 7 -

organization that regulates professionals and firms in the securities industry, had initiated an investigation into the trading activity in Wainwright stock that occurred immediately before the June 29th announcement. A list of individuals and companies accompanied the investigatory notice. FINRA asked Eastern to circulate the list to its officers and directors; if any Eastern officer or director recognized a name on the list, FINRA requested that the bank advise it of the nature of the relationship between the employee and the listed name. FINRA also asked that the bank tell it whether any communications among those parties had taken place before the Wainwright announcement.

Seeing Bray's name on the list, O'Neill panicked and rushed to Oakley to look for him. On finding Bray, O'Neill stressed that he could "lose [his] job over this." Bray tried to calm O'Neill down by assuring O'Neill that he had not "told anybody" about the tip and that "if the regulators c[a]me around asking questions," he would "have them wishing that they had bought [Wainwright] stock."[3]

On August 18, 2014, the Securities and Exchange Commission ("SEC") filed a civil insider trading action against O'Neill and Bray. Bray initially filed a pro se answer where he

_____

[3] Bray again offered to include O'Neill in the Watertown Project, this time for free. Because Bray and his business partners ultimately abandoned the Project, the offer never bore fruit.

- 8 -

denied receiving "any 'tip' from O'Neill," and later insisted in his answers to the SEC's first set of interrogatories that he had bought Wainwright shares because of the bank's environmentally-friendly policies and good dividends. He later admitted that both these things were untrue, but asserted that O'Neill had passed him the Wainwright tip unprompted.

On December 10, 2014, the government charged Bray with criminal securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff(a), and conspiracy to commit securities fraud in violation of 18 U.S.C. § 371. At the close of his trial, the district court instructed the jury on the elements of both offenses. As relevant here, the court told the jury that in order to convict Bray of securities fraud, it needed to find that he "knew or under all the circumstances . . . should have known" that O'Neill had breached a duty of confidentiality by giving him the Wainwright tip. Alternatively, the district court told the jury that it could find that Bray possessed the requisite knowledge if he had willfully blinded himself to O'Neill's breach; that is, if "under all the circumstances . . . a reasonable person in Mr. Bray's shoes would certainly have known that this information was being passed to him" in violation of a duty of confidentiality.

On January 28, 2016, the jury convicted Bray of committing securities fraud, but acquitted him of the conspiracy charge. The district court then sentenced Bray to 24 months in

prison, followed by 36 months of supervised release, and imposed a $1 million fine.

## II. Discussion

The unlawful trading in securities based on material, nonpublic information, or illegal insider trading, is a well-established violation of Section 10(b) of the Securities Exchange Act of 1934 and the Securities and Exchange Commission's Rule 10b-5. See United States v. Salman, 137 S. Ct. 420, 423 (2016); United States v. O'Hagan, 521 U.S. 642, 652 (1997); Dirks v. SEC, 463 U.S. 646, 653-54 (1983); Chiarella v. United States, 445 U.S. 222, 226-30 (1980); SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 847-48 (2d Cir. 1968) (en banc). In this case, the government premised Bray's prosecution on the "misappropriation" theory of insider trading liability. This theory posits that individuals entrusted with confidential information about a corporation cannot "secretly us[e] such information for their personal advantage," even when they do not owe any direct fiduciary duty to that corporation or its shareholders. Salman, 137 S. Ct. at 423. Instead, those entrusted with such information have a duty to abstain from trading in that corporation's securities or they must disclose the information ahead of time. Id. Thus, these individuals "commit[] a fraud 'in connection with' a securities transaction, and thereby violate[] § 10(b) and Rule 10b-5, when [they] misappropriate[] confidential information for securities trading purposes, in

- 10 -

breach of a duty to the source of the information." O'Hagan, 521
U.S. at 652.

The misappropriation theory "can also apply when the
misappropriator does not trade, but instead obtains a benefit by
revealing the information to a third person who trades based on
the misappropriated information." McPhail, 831 F.3d at 4. In
these "tipping" situations, the third person, or "tippee,"
inherits the misappropriator's, or "tipper's," abstain-or-disclose
duty "if the tippee knows the information was disclosed in breach
of the tipper's duty" and "may commit securities fraud by trading
in disregard of that knowledge." Salman, 137 S. Ct. at 423.
Liability therefore hinges on whether the tipper breached a duty
of trust and confidence by disclosing the inside information, which
in turn depends on whether the tipper "personally will benefit,
directly or indirectly, from [the] disclosure." Dirks, 463 U.S.
at 662; see also Parigian, 824 F.3d at 15 (stating that the
personal benefit analysis "seem[s] to call for the same answer in
both a civil and criminal proceeding").[4]

---

[4] The Supreme Court has developed the tipping liability
doctrine, including its personal benefit requirement, under the
"classical" theory of insider trading liability. Dirks, 463 U.S.
at 646; see also O'Hagan, 521 U.S. at 651-52 (stating that, in a
classical case, "§ 10(b) and Rule 10b-5 are violated when a
corporate insider trades in the securities of his corporation on
the basis of material, nonpublic information"). However, we have
previously acknowledged that "[t]here is some disagreement about
whether benefit to a . . . tipper is a required element of"
liability under the misappropriation theory. SEC v. Sargent, 229

- 11 -

Bray admits that he traded based on material, nonpublic information about Wainwright, that O'Neill owed Eastern a "duty of loyalty and confidentiality," O'Hagan, 521 U.S. at 652, and that O'Neill breached this duty by giving the Wainwright information to him. Still, Bray maintains that the government presented insufficient evidence proving that O'Neill expected a personal benefit in exchange for the Wainwright tip, that he knew O'Neill anticipated such a benefit in exchange for the tip, or that he knew O'Neill had breached a fiduciary duty by giving him the tip. Bray also insists that the trial court plainly erred by instructing the jury that it could convict him if he "should have known" that O'Neill had an obligation to keep the Wainwright information confidential. He similarly claims that the trial court wrongly equated the concept of "willful blindness," an alternative theory on which the government could prove Bray's knowledge, with negligence. We address each argument in turn.

A.  Sufficiency of the Evidence Claims

This court reviews sufficiency of evidence challenges de novo. United States v. García-Carrasquillo, 483 F.3d 124, 129-30

---

F.3d 68, 77 (1st Cir. 2000); see also Parigian, 824 F.3d at 15 (acknowledging disagreement); SEC v. Rocklage, 470 F.3d 1, 7 n.4 (1st Cir. 2006) (same). We do not need to resolve that disagreement here since, as we will explain, there was enough evidence such that a reasonable jury could conclude beyond a reasonable doubt that O'Neill disclosed the Wainwright tip in expectation of a personal benefit.

(1st Cir. 2007).  While doing so, we draw all reasonable inferences in the verdict's favor.  United States v. Alejandro-Montañez, 778 F.3d 352, 357 (1st Cir. 2015).  Thus, "[i]f a reasonable jury could find the defendant[] guilty beyond a reasonable doubt of all elements of the charged offense, we must affirm the conviction."  United States v. Rosado-Pérez, 605 F.3d 48, 52 (1st Cir. 2010).  "[D]efendants challenging the sufficiency of the evidence face 'an uphill battle.'"  United States v. Manso-Cepeda, 810 F.3d 846, 849 (1st Cir. 2016) (quoting United States v. Seng Tan, 674 F.3d 103, 107 (1st Cir. 2012)).  This battle, as it turns out, Bray cannot win.

### 1.  *O'Neill's Tipping Motivations*

To start, O'Neill's trial testimony provided a sufficient basis for the jury to infer that O'Neill gave Bray the Wainwright tip with the "purpose" of obtaining a personal benefit. See Dirks, 463 U.S. at 662.  When evaluating whether a tipper derived a personal benefit from his or her tip, we "focus on objective criteria, *i.e.*, whether the insider receives a direct or indirect personal benefit from the disclosure, such as a pecuniary gain or a reputational benefit that will translate into future earnings."  Id. at 663.  However, a personal benefit can "often" be inferred where "a relationship between the [tipper] and the recipient . . . suggests a *quid pro quo* from the latter, or an intention to benefit the particular recipient."  Id. at 664; see

- 13 -

also <u>Sargent</u>, 229 F.3d at 77 ("The 'benefit' to the tipper need not be 'specific or tangible.'" (quoting <u>SEC</u> v. <u>Warde</u>, 151 F.3d 42, 48-49 (2d Cir. 1998)). A personal benefit can likewise be inferred where a tipper makes a gift of "inside information to 'a trading relative or friend.'" <u>Salman</u>, 137 S. Ct. at 428 (quoting <u>Dirks</u>, 463 U.S. at 664); <u>see also</u> <u>Rocklage</u>, 470 F.3d at 7 n.4 (stating that "the mere giving of a gift to a relative or friend is a sufficient personal benefit").

Bray argues that an informational exchange between casual, as opposed to close, friends does not meet <u>Dirks</u>'s personal benefit requirement without some other evidence of a quid pro quo exchange.[5] Here, Bray claims that the evidence at trial did not establish either that he and O'Neill enjoyed a close relationship or that O'Neill gave him the Wainwright advice as a quid pro quo in expectation of a future benefit. These arguments, however,

---

[5] His argument stems from the Second Circuit's decision in <u>United States</u> v. <u>Newman</u>, where that court held that it could not infer a personal benefit "in the absence of proof of a meaningfully close personal relationship that generates an exchange that is objective, consequential, and represents at least a potential gain of a pecuniary or similarly valuable nature." 773 F.3d 438, 452 (2d Cir. 2014). The Supreme Court abrogated the latter half of this holding in <u>Salman</u>, rejecting any requirement "that the tipper . . . receive something of a 'pecuniary or similarly valuable nature' in exchange for a gift to family or friends." 137 S. Ct. at 428 (quoting <u>Newman</u>, 773 F.3d at 452). <u>Salman</u> did not, however, discuss the Second Circuit's "meaningfully close personal relationship" language, presumably because the tipper in the case "provided inside information to a close relative," namely "his brother." <u>Id.</u> at 427. Consequently, <u>Salman</u> does not foreclose Bray's argument.

amount to an attack on the credibility of the witnesses who testified against him. As we have often stated, "it is not the appellate court's function to weigh the evidence or make credibility judgments." E.g., United States v. Ortiz, 966 F.2d 707, 711 (1st Cir. 1992). Instead, we leave it to "the jury to choose between varying interpretations of the evidence." Id.; see also Alejandro-Montañez, 778 F.3d at 357 ("Testimony from even just one witness can support a conviction." (internal quotation marks and citation omitted)).

To that end, O'Neill's testimony showed that it is at least "plausible" that he and Bray had a close relationship. See Ortiz, 966 F.2d at 711. O'Neill claimed that he and "Bubba" were "good friends" who, at the time of the Wainwright tip, had known each other for fifteen years. The two men often socialized with each other at the club, dined with each other at local bars and restaurants, and even took each other's counsel. Bray's bond with Matthew, O'Neill's son, similarly demonstrated that Bray knew O'Neill well enough to extend favors to O'Neill's extended family. In other words, the government presented enough evidence for a reasonable jury to conclude that Bray and O'Neill had a close relationship, and not one that was "of a casual or social nature." Newman, 773 F.3d at 452; see also Sargent, 229 F.3d at 77 (concluding that there was sufficient evidence from which a jury could conclude that a tipper benefitted by tipping, in part because

the tipper and tippee were "friendly," had done favors for each other in the past, and enjoyed relationships with one another's extended families).

O'Neill's testimony also provided a sufficient basis for the jury to conclude that he disclosed the tip in expectation of a personal benefit. Though O'Neill initially testified that he did not know why he had given Bray the Wainwright tip, he then immediately said that he "figured [the tip] would enhance" his reputation with Bray. While O'Neill "did not expect anything at the exact time" he gave Bray the tip, a reasonable jury could infer that he expected a benefit "down the road." See United States v. Riley, 90 F. Supp. 3d 176, 184 (S.D.N.Y. 2015) ("The precise exchange need not be known by the parties at the time of the tip."), aff'd, 638 F. App'x 56 (2d Cir. 2016), cert. denied 137 S. Ct. 589 (2016). Bray's later offers to bring O'Neill into the Watertown Project for free further show that these expectations were warranted.

It bears emphasizing that our holding on this front is a narrow one. We need not determine, for instance, how "close" a tipper-tippee relationship must be before a jury can infer a gift-based personal benefit. Instead, we simply hold that the record's evidence of O'Neill and Bray's friendship, coupled with O'Neill's testimony that the tip might lead to certain future benefits, provided a sufficient basis for a reasonable jury to conclude that

O'Neill acted in expectation of a personal benefit.  See Parigian, 824 F.3d at 16 n.8 (stating that "anticipation of a personal benefit in return for a breach of duty surely suffices").

2. *Bray's Knowledge of O'Neill's Anticipation of a Benefit and Fiduciary Breach*

Liability for securities fraud also requires proof that the defendant acted with scienter, defined as "a mental state embracing intent to deceive, manipulate, or defraud."  Ernst & Ernst v. Hochfelder, 425 U.S. 185, 193 n.12 (1976).  With respect to criminal violations of § 10(b) and Rule 10b-5, this means that the government must "prove that the defendant 'willfully' violated the provision . . . that is, that the defendant acted with 'culpable intent.'"  Parigian, 824 F.3d at 11 (quoting 15 U.S.C. § 78ff(a), and O'Hagan, 521 U.S. at 666); see also United States v. Cassese, 428 F.3d 92, 98 (2d Cir. 2005) (defining willfulness "as a realization on the defendant's part that he was doing a wrongful act under the securities laws" and that such act "involved a significant risk of effecting the violation that . . . occurred" (internal quotation marks and citations omitted)).

With these principles in mind, we find sufficient evidence in the record to support a finding that Bray knew O'Neill tipped him in expectation of a personal benefit.[6]  Again, O'Neill

_____

[6] We note that the Supreme Court expressly declined to address what level or type of knowledge a criminal tippee must have regarding a tipper's receipt of a personal benefit.  Salman, 137

- 17 -

and Bray's close relationship is our starting point: though Bray may not have known the exact benefit O'Neill sought in exchange for the tip, a reasonable jury could have readily inferred O'Neill's intent to benefit Bray. See United States v. Salman, 792 F.3d 1087, 1092 (9th Cir. 2015) (observing, in the context of a three-person tipping chain, that an ultimate tippee could "readily have inferred" an insider's intent to benefit the initial tippee-turned-tipper based on his awareness of the insider and tipper's close relationship), aff'd, 137 S. Ct. 420 (2016).

Bray's actions after Eastern announced the Wainwright acquisition bolster this conclusion. He thanked O'Neill for the tip and, unprompted, offered him an opportunity to invest in the Watertown Project on two separate occasions, the same project for which he requested the tip in the first place. Before this, Bray had never offered O'Neill a similar opportunity and had rarely (if ever) made such offers to anyone else at Oakley. Consequently, the jury was entitled to conclude that Bray knew O'Neill sought a personal benefit in exchange for the tip.

---

S. Ct. at 425 n.1. For its part, the Second Circuit held that Dirks requires that a tippee must "know[] that the insider disclosed confidential information in exchange for a personal benefit." Newman, 773 F.3d at 448, 449. In their briefs, both Bray and the government seemingly assume that this standard applies. Ultimately, the issue is of no consequence since we find that a jury could reasonably conclude that Bray possessed the requisite knowledge even under the Second Circuit's standard.

A reasonable jury could also infer that Bray knew O'Neill had breached a duty of confidentiality by giving him the Wainwright tip. Though O'Neill did not tell Bray that he was working on the Wainwright acquisition, Bray knew what O'Neill did for a living and, presumably, that O'Neill had evaluated potential acquisition targets in the past. Similarly, up until that point, O'Neill had only given Bray investing advice based on publicly-available information in the course of casual conversation. However, this time Bray expressly requested a "tip" on which he could make a "big score." O'Neill then passed Bray the Wainwright tip in a surreptitious manner, after which Bray neither made any comments nor asked any questions.

The actions Bray took after receiving the tip are equally compelling. The day after getting the Wainwright tip, Bray sold thousands of shares in his trading account, generating hundreds of thousands of dollars in proceeds, and then immediately used those funds to buy tens of thousands of Wainwright shares. Though Bray was no stranger to holding concentrated positions in his portfolio -- at one point in 2009, 40% of his overall account holdings were in Citigroup -- he had never previously held such a position in a stock as illiquid as Wainwright.[7] Unlike all his previous ignoring

---

[7] The record shows that Citigroup shares, for example, routinely had daily trading volumes in the tens of millions. These numbers differed drastically from those for Wainwright shares, which typically topped out in the low thousands.

of O'Neill's prior stock recommendations, in this instance Bray bought as many Wainwright shares as possible over the next month, a move even he admitted to his E*Trade broker seemed "kind of ridiculous."  Later, when O'Neill went to Bray with news of the FINRA inquiry, Bray did not act surprised when he "learned" that the tip stemmed from nonpublic information or think to ask why O'Neill had given him a tip in breach his duty of confidentiality. Instead, Bray's first instinct was to assure O'Neill that he had not told anyone about the tip and to develop a cover story.

Simply put, all of the evidence regarding the tip and its aftermath show that there was a sufficient basis from which a jury could reasonably conclude beyond a reasonable doubt that Bray knew O'Neill had anticipated a benefit and breached a fiduciary duty to his employer.

B. Jury Instruction Claims

We now turn to Bray's challenges concerning the district court's jury instructions.  Bray claims he is at least entitled to a new trial because the district court wrongly instructed the jury on the mens rea element of his offense.  Specifically, Bray argues that the district court erroneously told the jury that it could convict him of securities fraud so long as it found that he "knew or . . . should have known" that O'Neill had breached a duty of confidentiality by giving him the Wainwright tip.  Bray similarly

insists that the district court's instructions also erred by equating the concept of "willful blindness" with negligence.

Since Bray did not object to these instructions at trial, we review for plain error.[8] See Fed. R. Crim. P. 30(d); United States v. Paniagua-Ramos, 251 F.3d 242, 246 (1st Cir. 2001). In order to establish plain error, Bray must show "(1) that an error occurred; (2) that the error was clear or obvious; (3) that the error affected his substantial rights; and (4) that the error also seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Riccio, 529 F.3d 40, 46 (1st Cir. 2008), modified on reconsideration, 567 F.3d 39 (1st Cir. 2009). The standard is "exceedingly difficult to satisfy in jury instruction cases." United States v. González-Vélez, 466 F.3d 27, 35 (1st Cir. 2006). "[H]ence, reversal constitutes a remedy that is granted sparingly." United States v. Gelin, 712 F.3d 612, 620 (1st Cir. 2013).

_____

[8] The Government argues that Bray waived his challenge to the "knew or under all the circumstances . . . should have known" instruction because he affirmatively requested that the district court use that language and referenced the instruction during his opening statement and closing arguments. However, Bray's proposed instruction concerned O'Neill's knowledge of the Wainwright information's confidential status, not Bray's personal knowledge of O'Neill's fiduciary breach. Meanwhile, Bray's opening statement and closing arguments came after the district court had endorsed this language. In our view, these actions do not evidence an "intentional relinquishment or abandonment of a known right." United States v. Olano, 507 U.S. 725, 733 (1993) (quoting Johnson v. Zerbst, 304 U.S. 458, 464 (1938)).

- 21 -

Nonetheless, our recent decisions show that the district court clearly erred by including the "should have known" language in its jury instructions. McPhail, 831 F.3d at 9 (indicating that the standard, as applied to a tipper's knowledge regarding whether a duty of trust and confidence arose between him and his source of information, "was likely error"); Parigian, 824 F.3d at 11 (stating that "the 'knew or should have known' formulation runs up against a decades-long presumption that the government must prove that the defendant knew the facts that made his conduct illegal" (citing Elonis v. United States, 135 S. Ct. 2001, 2009-10 (2015), Staples v. United States, 511 U.S. 600, 605-06 (1994), and United States v. Ford, 821 F.3d 63, 67-72 (1st Cir. 2016))). Though Bray's trial predated these decisions, "[t]he plainness of an error is considered at the time of an appeal." United States v. Morales, 801 F.3d 1, 10 (1st Cir. 2016) (citing Henderson v. United States, 133 S. Ct. 1121, 1124-25 (2013), and United States v. Farrell, 672 F.3d 27, 36 (1st Cir. 2012)). Moreover, though neither of these cases actually held that a district court's use of the "should have known" standard constituted clear error, "[t]he absence of a decision directly on point does not remove the potential for a finding of plain error." Id. Rather, "the inquiry is always whether the error is open to doubt or question." Id. In this sense, McPhail and Parigian make the error "plain," especially in light of recent guidance from the Supreme Court. See Salman, 137

S. Ct. at 423 (stating that a "tippee acquires the tipper's duty to disclose or abstain from trading if the tippee *knows* the information [given to him by the tipper] was disclosed in breach of the tipper's duty" of confidentiality (emphasis added)). Accordingly, Bray's challenge to the "should have known" language in the district court's jury instructions survives the first two prongs of the plain error test.

The principles expressed in these and other cases likewise indicate that the district court clearly erred in defining the "willful blindness" standard. See Global-Tech Appliances, Inc. v. SEB S.A., 563 U.S. 754, 769-70 (2011) (noting that willful blindness has "an appropriately limited scope that surpasses recklessness and negligence" and expressly contrasting willful blindness with "a negligent defendant . . . who should have known of a similar risk but, in fact, did not"). A willful blindness instruction is meant to "inform[] jurors that they may 'impose criminal liability on people who, recognizing the likelihood of wrongdoing, nonetheless consciously refuse to take basic investigatory steps.'" United States v. Griffin, 524 F.3d 71, 77 n.4 (1st Cir. 2008) (quoting United States v. St. Michael's Credit Union, 880 F.2d 579, 585 (1st Cir. 1989)). The instruction in this case, however, mistakenly suggested that the jury could find Bray had willfully ignored O'Neill's fiduciary breach even if Bray had not "consciously and deliberately avoided learning" about the

violation.  See United States v. Pérez-Meléndez, 599 F.3d 31, 41 (1st Cir. 2010).

Regardless, even if we assume, without deciding, that these errors affected Bray's substantial rights,[9] our resolution of Bray's sufficiency of the evidence claims shows that he cannot satisfy the fourth prong of plain error review.  See United States v. Kinsella, 622 F.3d 75, 83 (1st Cir. 2010) (holding that we may affirm a conviction notwithstanding an obvious or prejudicial error if "the error does not distort the fairness or integrity of lower court proceedings in some extreme way").  That is, the government presented ample evidence that Bray knew O'Neill had breached a duty of confidentiality by tipping, or at least possessed the requisite "culpable intent."  Parigian, 824 F.3d at 11.

Bray relies on our decision in United States v. Delgado-Marrero, where we held that an instructional error met the fourth

---

[9] Our assumption regarding the third prong of the plain error test may prove dubious.  "[I]n most cases," this prong of the plain error test requires that "the error . . . have been prejudicial: It must have affected the outcome of the district court proceedings."  United States v. Olano, 507 U.S. 725, 734 (1993). Viewing the challenged instructions against the backdrop of the jury charge as a whole, United States v. Pennue, 770 F.3d 985, 990 (1st Cir. 2014), and considering the strength of the government's evidence on the knowledge issue, it seems "quite likely" that a jury would have convicted Bray even had it been instructed as he now suggests, United States v. O'Brien, 435 F.3d 36, 40 (1st Cir. 2006).  Regardless, both of these factors weigh heavily on our analysis under the fourth prong of the plain error test as well.

prong of the plain error test because the evidence offered against the defendant on the contested element was not "overwhelming and uncontroverted."  744 F.3d 167, 189 (1st Cir. 2014) (citing United States v. Cotton, 535 U.S. 625, 631-33 (2002)).  He claims that even if the government's evidence as to his knowledge of O'Neill's fiduciary breach were legally sufficient, the question was close enough such that a properly instructed jury could have acquitted him, thereby implicating Delgado-Marrero and the fourth plain error prong.  However, Bray's argument again downplays the strength of the government's evidence against him.  Here, the evidence against Bray was not merely sufficient; it was overwhelming, and that means that the fourth prong of the plain error test was not met.  Bray's furtive behavior in the pub room, coupled with the fact that he engaged in trading behavior that even he admitted would seem "ridiculous" to someone possessing only publicly-available information, provided a solid basis for the jury's guilty verdict.  Similarly, Bray did not contest the accuracy of these key pieces of circumstantial evidence at trial.  When cross-examining O'Neill, Bray merely suggested that O'Neill had not informed him about Eastern's possible acquisition of Wainwright or O'Neill's specific role in that process.  Bray did not, however, dispute the manner in which the Wainwright tip exchanged hands or the actions he took after receiving the tip.

Furthermore, the district court emphasized to the jury that the government had to prove "Bray acted willfully, knowingly, and with the intent to defraud." The district court did not render Bray's state of mind "an inconsequential afterthought," Delgado-Marrero, 744 F.3d at 187, and therefore any instructional error was "simply not of such magnitude or consequence that it would undermine faith in the judicial system were it to stand uncorrected," United States v. Padilla, 415 F.3d 211, 221 (1st Cir. 2005).

In sum, different jury instructions "would have been of little help" to Bray. See United States v. Cormier, 468 F.3d 63, 72 (1st Cir. 2006). Therefore, Bray has "fallen short of the 'rather steep' road to success under the 'exacting' plain-error standard." See Delgado-Marrero, 744 F.3d at 203 (quoting Gelin, 712 F.3d at 620, and Long v. Fairbank Reconstruction Corp., 701 F.3d 1, 5 (1st Cir. 2012)).

### III. Conclusion

For the foregoing reasons, we affirm Bray's conviction.